**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

**ANTHONY DESHAWN LAMAR**                                                      **PLAINTIFF**
**ACD# 120479**

**V.**                   **CASE NO. 5:14-CV-00345-JM/BD**

**CONNIE HUBBARD**                                                                      **DEFENDANT**

**RECOMMENDED DISPOSITION**

**I.**     **Procedure for Filing an Objection:**

This Recommended Disposition ("Recommendation") has been sent to United States District Judge James M. Moody Jr. Ether party to this suit may file written objections with the Clerk of Court within fourteen (14) days of filing of the Recommendation. Objections must be specific and must include the factual or legal basis for the objection.

By not objecting, you may waive any right to appeal questions of fact. And, if no objections are filed, Judge Moody can adopt this Recommendation without independently reviewing the record.

**II.**    **Background:**

The Plaintiff Anthony Deshawn Lamar, an Arkansas Department of Correction inmate ("ADC"), filed this lawsuit *pro se* under 42 U.S.C. § 1983 alleging that, while he was housed in Delta Regional Unit, Defendants Connie Hubbard and Micheline Olson failed to provide him with constitutionally adequate medical care for a stress fracture.

1

(Docket Entry #2) Mr. Lamar also alleges that Ms. Hubbard acted with deliberate indifference to his medical needs after the stress fracture merged into a complete fracture. (#2) Mr. Lamar voluntarily dismissed Ms. Olson from the case (#22, #23) when he was unable to serve her with process within the time limits set under the Federal Rules of Civil Procedure. (#7, #13)

Ms. Hubbard answered the complaint by admitting that she administered medical treatment to Mr. Lamar from July 24, 2013, until he was transferred from the Delta Regional Unit. Ms. Hubbard has now moved for summary judgement, arguing that Mr. Lamar's deliberate indifference claims fail as a matter of law. (#74) Mr. Lamar has responded to Ms. Hubbard's motion. (#79, #81, #82) Ms. Hubbard replied to Mr. Lamar's statement of the facts and requests her statement of the facts be deemed admitted. (#88, #89)

For the reasons set forth below, Ms. Hubbard's motion for summary judgment (#74) should be GRANTED.

III.   **Discussion:**

    A.   Standard:

Summary judgment is proper when the moving party presents evidence, viewed in the light most favorable to the nonmoving party, showing that there is no real dispute as to any material fact. FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party meets

this burden, the nonmoving party must come forward with evidence showing that there is a genuine dispute that must be decided at a trial. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (citing *Celotex Corp.*, 477 U.S. at 323). If the nonmoving party does not come forward with evidence sufficient to establish a necessary element of his case, the moving party is entitled to the judgment as a matter of law. *Celotex Corp.,* 447 U.S. at 323.

  B. <u>Deliberate Indifference to Medical Needs</u>:

    1. <u>Factual Background</u>:

Mr. Lamar started complaining about shin pain in 2012, but the pain was off and on. (#75) He was placed on medical restrictions from February 19, 2013 to February 21, 2013. (#75-4 at p. 3) On June 7, 2013, Mr. Lamar noticed a nodule or knot on his left shin and subsequently placed a sick call into the infirmary. (#75) Then, on June 11, 2013, Mr. Lamar saw Nurse Hawkins about pain and numbness in both of his legs. (#75-4 at p. 24).

On July 19, 2013, Mr. Lamar saw Nurse Stills during his sick call complaining that his shaving restriction and medical shoes prescription needed to be renewed, his blood work was overdue, and the status of his doctor visit with regards to his shin pain. (#75-4 at p. 29) Nurse Stills noted there was no swelling to his shins and placed him on the list to see the doctor. (#75-4 at p. 29)

On July 24, 2013, Ms. Hubbard examined Mr. Lamar after he complained about tingling in his lower legs and described a knot on his left shin.[1] (#75-4 at p. 33) Ms. Hubbard confirmed a firm, nodular area on his left tibia, ordered an x-ray, and instructed him to stay off his legs and to not play any sports until the x- ray of his left tibia comes back. (#75-4 at pp. 33-34; #75-1 at p. 66)

On July 30, 2013, Mr Lamar underwent an x-ray of his left tibia, and Ms. Hubbard received the results later that day. (#75-4 at pp. 36-38) In the x-ray report, the history section notes "stress fracture." The radiologist's impression was that it was a stress fracture that was healing with associated overlying soft tissue swelling. (#75-4 at pp. 36-37) A Medical Department Notification of Diagnostic Test Results was placed in Mr. Lamar's medical record by Ms. Hubbard stating he was supposed to be seen within three working days, but he was not seen within three working days.[2] (#75-4 at p. 38; #2 at p. 9)

In a Condensed Consultation Request dated August 2, 2013, there were no comments in the x-ray section. (#75-4 at p. 40) But in another Condensed Consultation Request dated August 7, 2013, the related x-ray comment was time stamped August 6, 2013, by Christina Ritchey. (#75-4 at p. 39) Following the Condensed Consultation

---

[1]The majority of the other medical information came from the Medical Patient Treatment Received record printed on September 30, 2014, however, Mr. Lamar's appointment with Ms. Hubbard on July 24, was missing and in its place was a Condensed Health Service Encounter dated October 17, 2014.

[2]Mr. Lamar contends he did not receive the notification to review his x-rays results.

Request, another Medical Department Notification of Diagnostic Test Results requested Mr. Lamar be seen within three business days. (#75-4 at p. 41)

On August 8, 2013, Ms. Hubbard received Mr. Lamar's lab test results for his thyroid. (#75-4 at p. 42) On August 9, 2013, Ms. Hubbard reviewed the lab results with Mr. Lamar and discussed the plan of care. There are, however, no notes regarding a discussion of the x-ray results. (#75-4 at pp. 42-43)

On August 13, 2013, Mr. Lamar was scheduled to see Ms. Hubbard to review his chronic care and x-ray results, but his jacket was not available for review so he was rescheduled for the next day. (#75-4 at pp. 45-47) On August 14, 2013, Mr. Lamar was seen for a chronic care visit. There is no indication, however, that Ms. Hubbard discussed his x-ray results from July 30, 2013, or that she ordered a second x-ray of his left tibia. (#75-4 at p. 47) That is contradictory to the Condensed Health Service Encounter dated August 14, 2013, and Clinical Orders that indicate that Ms. Hubbard had ordered a second x-ray of Mr. Lamar's left tibia. (#75-4 at pp. 49-50, # 75-2 at p.134) On August 20, 2013, Mr. Lamar saw Ms. Hubbard for neuropathy, but again there is no indication his x-ray results from July 30, 2013, were discussed.[3] (#75-4 at pp. 56-57)

On August 21, 2013, Mr. Lamar was taken into the infirmary after physical contact with another inmate during his basketball game, which resulted in his left tibia being

---

[3]The Condensed Consultation Request was dated August 22, 2013.

completely fractured. (#75-4 at pp. 58-59) An x-ray was taken the same day. The radiologist found it was a complete fracture and compared it to the July 30, 2013 x-ray. (#75-4 at p. 60) Ms. Hubbard confirmed the findings and discussed the treatment with Dr. Floss over the phone. (#75-4 at p. 61) Mr. Lamar's leg was placed in a splint; he was given a wheel chair for two weeks; and he was prescribed Tramadol on August 22, 2013. (#75-4 p. 67)

On August 23, 2013, Mr. Lamar grieved that he had not received proper medical treatment for his left leg, complaining that, after his injury, he was given pain medication instantly, but did not receive any additional pain medication for approximately 24 hours. (#2 at pp. 21-23) Mr. Lamar exhausted all his administrative remedies and on appeal his case was found to have merit due to the delay in receiving prescribed pain medication. (#2 at p. 23) Also, Mr. Lamar grieved that the medical department failed to adequately treat his stress fracture until after his shin completely fractured. (#2 at p. 22) The appeal director did not address this issue because Mr. Lamar could not grieve two issues in one grievance. (#2 at p. 23)

On August 28, 2013, Ms. Hubbard prescribed Codeine if Tramadol was unavailable until September 1, 2013. (#75-4 at p. 72) Also, Mr. Lamar filed a grievance contending that Ms. Hubbard and the Medical Department lied to him about his stress fracture being healed when the x-ray results said healing, and that Ms. Hubbard did not review his x-ray results with him prior to the complete fracture. (#2 at pp. 24-26) Mr.

6

Lamar exhausted all his administrative remedies, and the service health administrator found merit on his claim of not receiving notice of the x-ray results. (#2 at p. 25) On appeal, the director agreed that the x-ray results showed a healing stress fracture not a healed stress fracture, but found the grievance without merit because Ms. Hubbard is licensed to practice medicine and treated Mr. Lamar as she deemed appropriate based on her medical judgment. (#2 at p. 26)

Again on August 28, 2013, Mr. Lamar grieved that he did not receive proper medical treatment because he was not taken to the hospital, was not instructed on how to use crutches before returning to the barracks, did not receive timely pain medication, was given no restrictions, and, when he saw Dr. Crowell for the first time, the doctor did not provide him any treatment. (#2 at pp. 27-29) On appeal, Mr. Lamar's grievance was found to have merit because his restrictions were not entered into the computer, and there was no indication he was properly educated on the use of crutches or self care.[4] (#2 at p. 29)

On September 1, 2013, Mr. Lamar complained about the upcoming expiration of his pain medication, and the next day he was given a plastic bag to cover his leg while showering. (#75-4 at p. 64; #75-4 at p. 73) On September 9, 2013, Mr. Lamar complained of pain after undergoing surgery to stabilize his left tibia. (#75-4 at p. 85) Dr. Crowell recommended a pain management schedule for post surgery. (#75-4 at pp.

---

[4]The delay in pain medication was already addressed in a previous grievance.

65-66, #75-4 at pp. 75-80)  Mr. Lamar was supposed to get Vicodin every six hours for one week, then Tylenol #3 every six hours for a week, followed by Tramadol.  (#75-4 at pp. 84-86)

     Mr. Lamar's leg was examined on September 16, 2013  (#75-4 at p. 88)  and again on September 20, 2013.  (#75-4 at p. 92)  On September 19, 2013, Mr. Lamar had another x-ray of his left tibia, which showed healing compared to the x-ray from August 21, 2013.  (#75-4 at p. 91)  On September 25, 2013, Mr. Lamar saw Dr. Crowell for his follow-up appointment and was scheduled for another x- ray in four weeks.[5]  (#75-4 at pp. 95-102)  After returning from Dr. Crowell's visit, Mr. Lamar refused to be examined by ADC staff at the infirmary stating that he had seen the doctor about a prescription renewal and his problem had "gone away."  (#75-4 at p. 104)

     On September 21, 2013, Mr. Lamar grieved that he did not received adequate pain medication after his surgery.  (#2 at p. 30)  He claimed that Dr. Crowell would not provide him any pain medication after waking up after surgery and, when he returned to the Delta Unit, he received only two Tramadol from a pre-existing prescription.  (#2 at pp. 30-31)  When Ms. Hubbard arrived at the infirmary, she did not authorize any additional pain medication until the next pill call.  (#2 at pp. 30-31)  On appeal, Mr. Lamar's grievance was found to have merit because the staff did not follow policy when

---

[5]This x-ray report is not in the record.

they gave him pain medication from a pre-existing prescription instead of calling the provider for medication authorization. (#2 at p. 32)

On October 30, 2013, Mr. Lamar saw Dr. Crowell and discussed the healing of his left tibia. (#75-4 at p. 111) On January 22, 2014, Mr. Lamar's left leg was x-rayed and the findings revealed that his leg was nearly healed. (#75-4 at p. 112)

2. Analysis**:**

Determining whether an official was deliberately indifferent to an inmate's medical needs requires both objective and subjective analyses. *Scott v. Benson*, 742 F.3d 335, 339-340 (8th Cir. 2014) (citing *Coleman v. Rahija*, 114 F.3d 778, 784-786 (8th Cir. 1997). To prevail, Mr. Lamar first must establish that he suffered from an objectively serious medical need. *Scott*, 742 F.3d at 340 (citing *Coleman*, 114 F.3d at 784-786). Next, for Ms. Hubbard to be liable, Mr. Lamar must show that she "actually knew of but deliberately disregarded [his] serious medical need." *Scott*, 742 F.3d at 340. This requires Ms. Hubbard's mental state to be "akin to criminal recklessness." *Scott*, 742 F.3d at 340 (quoting *Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006)).

Mr. Lamar must show "more than negligence, more even than gross negligence." *Fourte v. Faulkner County, Ark.*, 746 F.3d 384, 387 (8th Cir. 2014) (quoting *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)). "Merely demonstrating that a prison doctor committed medical malpractice is insufficient to establish deliberate indifference." *Jackson v. Buckman*, 756 F.3d 1060, 1065-1066 (8th Cir. 2014) (citing *Estelle v. Gamble*,

429 U.S. 97, 106 (1976); *Fourte*, 746 F.3d at 389).  Mr. Lamar must show that Ms. Hubbard's actions were "so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." *Dulany v. Carnahan*, 132 F.3d 1234, 1240-1241 (8th Cir. 1997) (citing *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990)).

     a. <u>Treatment of the Stress Fracture</u>:

Mr. Lamar alleges that Ms. Hubbard was deliberately indifferent to his stress fracture.  He contends Ms. Hubbard did not discuss the results of the x-ray from July 30, 2013, and she did not provide him treatment for the stress fracture.

Viewing the evidence in the light most favorable to Mr. Lamar, Ms. Hubbard did not review the x-ray with Mr. Lamar.  Every time Ms. Hubbard reviewed results from a medical test with Mr. Lamar, she would indicate doing so in her encounter notes.  But from the time of the x-ray until the time of the complete fracture, there was only one note in the record, and that note was from a visit that had to be rescheduled because his medical jacket was missing.  (#75-4 at p. 45)  Mr. Lamar's medical records do not indicate that Ms. Hubbard discussed the July 30 x-ray results with him.  (#82 at pp. 166-174)

In Mr. Lamar's grievance, he contends that Ms. Hubbard told him his left tibia was healed  (#2 at p. 24),  and she contends that she ordered a second x-ray on August 14, 2013. (#75-2 at pp. 22-28)  According to the medical records, Mr. Lamar's tibia was healing and not healed  (#2 at p. 26), but there is conflicting information about whether

Ms. Hubbard ordered the second x-ray. On Mr. Lamar's encounter notes, there is no order for an x-ray (#75-4 at p. 47), but on the condensed report and clinical orders there was an order for an x-ray. (#75-4 at pp. 49-50, # 75-2 at p.134)

At his deposition, Mr. Lamar testified that he reviewed his x-ray results with Ms. Hubbard on August 14, 2013. (#75-2 at pp.8-9, 11) He states that she told him that, "the matrix of [his] tibia had shifted from playing so much basketball and that is what was causing the pain." (*Id*. at p.12) Mr. Lamar contends Ms. Hubbard should have told him she suspected a fracture. But Mr. Lamar acknowledged that Ms. Hubbard did not purposefully withhold the diagnostic test result notification sheet regarding the x-rays from him. (#75-1 at pp. 95, 99)

Ms. Hubbard attaches the affidavit of Dr. Earl Peeples, a Board Certified Orthopedic Surgeon, to her statement of facts. Dr. Peeples reviewed Mr. Lamar's medical records and opined that the care and treatment he received from Ms. Hubbard for his leg was appropriate. (#75-5 at p. 2) She directed him to stay off of his leg and not play sports. (*Id*.) Immediately prior to completely fracturing his leg playing basketball, he had not been experiencing pain or a lack of function. (*Id*. at pp. 2-3, #75-1 at p. 83, #75-2 at p. 27) The collision Mr. Lamar was involved in on the basketball court caused the fracture. (#75-5 at p. 3) Accordingly, even if Ms. Hubbard failed to order a second x-ray or properly discuss the July 30th x-ray results with Mr. Lamar, her treatment of his stress fracture did not amount to deliberate indifference.

b.      Treatment following the Fracture:

Mr. Lamar complains that Ms. Hubbard delayed providing him pain medication and medical restrictions, and failed to properly educate him on how to use crutches following his September 9, 2013 surgery to repair his fractured leg. (#75-2 at p. 38, 57, 66)

After Mr. Lamar fractured his leg and before he had surgery to repair the fracture, he had crutches for two days. (*Id*. at p. 58) He complains that he slipped a couple of times. (*Id*. at 57) He received a wheelchair on August 23, 2013. (*Id*. at p. 63) Mr. Lamar's complaint does not amount to deliberate indifference.

Mr. Lamar also complains that following his surgery he did not receive pain medication and medical restrictions. Dr. Crowell, who performed the surgery, did not give him pain medications but wrote a recommendation for Vicodin, to be followed by Tylenol 3 or Tramadol as healing progressed. (#75-2 at p. 67) Mr. Lamar testified that he arrived back to the ADC at about 4 p.m. and was provided two Tramadol tablets. (#75-2 at p. 67) He states that Ms. Hubbard was not there and contends nobody called her that afternoon. (*Id*. at p. 68, 70-71) When Ms. Hubbard arrived, she issued a verbal order for hydrocodone, one by mouth every six hours, as needed for seven days for pain at 5:30 p.m., and he received hydrocodone at 11 p.m. (*Id*. at p. 69)

Even assuming Ms. Hubbard's actions delaying Mr. Lamar's receipt of pain medication was negligent, her actions do not rise to the level of deliberate indifference.

Dr. Peeples reviewed the care Mr. Lamar received following his fracture and found it to be appropriate. (#75-5 at p. 3) He notes that Mr. Lamar was referred to an orthopedic surgeon, and he received appropriate analgesics from Ms. Hubbard before and after surgery. (*Id.*)

Even if Ms. Hubbard failed to teach Mr. Lamar how to use crutches, failed to immediately enter his restrictions and prescribe medication, her actions do not amount to deliberate indifference. *Estelle*, 429 U.S. at 106; *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997).

## IV.  Conclusion:

Mr. Lamar's claims that Ms. Hubbard was deliberately indifferent in treating his leg fail. Accordingly, the Court recommends that Ms. Hubbard's motion for summary judgement (#74) be GRANTED, and Mr. Lamar's claims be DISMISSED, with prejudice.

DATED this 3rd day of December, 2015.

_____
UNITED STATES MAGISTRATE JUDGE